**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

**State of West Virginia ex rel. T.K.,**
**Petitioner**

**vs.) No. 19-1135 (Jackson County 19-JA-108)**

**The Honorable Lora Dyer,**
**Judge of the Circuit Court of Jackson County,**
**West Virginia, the West Virginia Department of**
**Health and Human Resources, and T.C.**
**Respondents**

**FILED**
**May 26, 2020**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**MEMORANDUM DECISION**

The guardian ad litem ("the GAL"), Erica Brannon Gunn, of the infant child, T.K.,[1] invokes this Court's original jurisdiction, seeking a writ of prohibition to prevent the circuit court from enforcing its November 25, 2019, order. In its order, the circuit court found that the respondent maternal grandmother, T.C. ("grandmother"), was nonabusing, and directed that the physical custody of T.K. be returned to her. A response in opposition to the writ was filed by the grandmother, through her counsel Roger L. Lambert. A summary response in opposition to the requested writ was also filed by the respondent circuit court judge, The Honorable Lora A. Dyer, as a self-represented litigant.

This Court has considered the parties' briefs,[2] oral arguments, and the record submitted. Upon consideration of the standard of review, the Court denies the petition for writ of prohibition. In light of our prior precedent on the dispositive issue presented in this case, we dispose of this matter under Rule 21 of the West Virginia Rules of Appellate Procedure.

---

[1] Because this case involves children and sensitive matters, we follow our practice of using initials to refer to the children and the parties. *See* W.Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W.Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2] We note at the outset that the West Virginia Department of Health and Human Resources ("the DHHR") failed to submit a brief or to provide any status updates concerning T.K. with this Court, despite being required to do so by the Court's procedural rules, *see* West Virginia Rule of Appellate Procedure 11, and being specifically directed to do so by the Court in its December 17, 2019, scheduling order. Additionally, the DHHR did not participate in oral arguments before this Court. It is inexplicable, and of great concern, to this Court that the DHHR did not participate in this case, especially in light of the fact that the circuit court's order, which is the focus of this extraordinary proceeding, places T.K.'s legal custody with the DHHR.

1

## I. Facts and Procedural Background

T.K.[3] was the subject of several guardianship proceedings prior to the instant abuse and neglect proceeding.[4] Prior to March 16, 2016, he was placed in the custody and care of his paternal grandfather in Jackson County, West Virginia. The paternal grandfather passed away, and T.K. was then placed, through another guardianship proceeding, into the custody of a family friend, R.F., by order entered March 16, 2016, in Jackson County Case No. 11-CIGR-6. T.K. remained with R.F. until April 27, 2018, when T.K.'s mother, T.T. ("mother"), petitioned the circuit court for return of custody of T.K. As a result of the mother's petition, T.K. was returned to her on June 26, 2018, upon the circuit court's finding that she had sufficiently improved her circumstances to justify the termination of the guardianship.

Between June 26, 2018, and May 2019, T.K. remained with his mother in the State of Ohio. His mother testified at the preliminary hearing in the abuse and neglect proceeding[5] that she placed T.K with the grandmother in May of 2019 because "I believe that she was going to be able to give him proper attention that he needs on top of—he became very aggressive up there with us and his little sister."[6] T.K.'s mother indicated that there was an incident in which T.K. threw air freshener gel beads into his sister's room in hopes that she would eat them, and that T.K. also started destroying things around the house and stealing. T.K.'s mother also testified that T.K. had wanted to kill himself or hurt himself. She sought mental health treatment for her son, but the situation got to the point where she did not think she could handle him anymore; therefore, at the end of the school year, the child came to West Virginia to stay with the grandmother.

On June 12, 2019, the grandmother filed a petition for guardianship of child, and on August 6, 2019, a hearing was held on that petition. Thereafter, by order entered August 14, 2019, the circuit court appointed the grandmother as T.K.'s temporary guardian. Despite the GAL's current position, she did not object to this temporary appointment.

---

[3] T.K. was nine years old in 2019.

[4] There is no evidence of any of the prior guardianship proceedings in the record before the Court. The information regarding these proceedings is gleaned from the parties' briefs.

[5] It is important to clarify that this case involves the consolidation of a guardianship proceeding with an abuse and neglect proceeding as set forth in more detail *infra* in this decision. This preliminary hearing occurred in connection with the abuse and neglect petition that was filed by the GAL on September 5, 2019.

[6] T.K.'s sister, who was not the subject of any of the guardianship proceedings or the abuse and neglect proceeding, was four years old.

2

In connection with the guardianship proceeding, the circuit court ordered the DHHR to investigate.[7] According to a September 4, 2019, "Disposition of CPS Investigation Report for Family and Circuit Courts" ("investigation report"), which was submitted to the circuit court prior to the scheduled final hearing in the guardianship proceeding, the request to investigate was made by the circuit court based on allegations that mother, who was not a West Virginia resident, was allowing her mother, the respondent grandmother, to take guardianship of the child. According to the investigative report, T.K. was residing with his grandmother and appeared to be well taken care of. He "presented as friendly and curious." The child stated that "he loves being with grandma," and appeared to be bonded with her. T.K. disclosed no abuse that had occurred at his mother's home in Ohio, and he did not disclose any fears. Significantly, it was reported that the child was "receiving medical care and being well-cared for." According to the investigative report, "Mother sent him to grandmother's because she could not deal with his extreme outbursts." There were no negative aspects of the report regarding grandmother. Child Protective Services ("CPS") determined that T.K.'s mother had placed the child with "a protective caregiver when the child's behaviors became too much for the mother to cope with. Mother recognized that she was unable to care for the child and agreed for . . . [the grandmother] to care for . . . [the child.]" Further, the investigative report indicated that there was no CPS history found. As a result of this investigation, CPS found that "maltreatment . . . [was] not . . . substantiated" The CPS case was closed with no petition being filed.

Notwithstanding the DHHR's positive investigative report, on September 5, 2019, the petitioner GAL filed a juvenile abuse and neglect petition on T.K.'s behalf, naming the child's grandmother, mother, and biological father, as respondents.[8] The allegations in the petition directed towards the grandmother focused on a CPS history and associated criminal charge, the failure to seek mental health treatment for T.K., and a lack of contact between T.K. and the grandmother for several years prior to the mother's placement of the child with his grandmother. Specifically, the GAL alleged that "[a]lthough . . . [the grandmother] was granted temporary custody of the minor child, further investigation has determined that she is not an appropriate caregiver for the child due to a lengthy CPS history." The GAL also alleged the grandmother was "charged criminally after an incident where here [sic] children were left alone. By her own admission . . . [the grandmother] states that she was 'banned from the [S]tate of Pennsylvania.'"

---

[7] *See* W. Va. R. Minor Guard. P. 13(b) and W. Va. R. Child Abuse and Neglect P. 3a (providing for the circuit court to direct the DHHR to submit to the circuit court an investigation report to determine if there are allegations or other information that present reasons to believe a child may be in imminent danger).

[8] Regarding the allegations in the abuse and neglect petition involving T.K.'s mother and biological father, the grandmother's and GAL's status updates on the child submitted to this Court pursuant to West Virginia Rule of Appellate Procedure 11(i) and (j) reflect that the father's parental rights were terminated on February 19, 2020, and the mother voluntarily relinquished her parental rights on the same day. The GAL's petition for writ of prohibition does not involve either T.K.'s father or mother as it is focused solely on the circuit court's order involving the child's placement with his grandmother. Accordingly, we do not address any aspects of the petition and the concomitant dispositions relating to T.K.'s mother or biological father.

Further, the GAL averred that T.K. had not received any mental health treatment since being in the grandmother's custody, including that "[t]he grandmother and mother made statements that they do not believe that he needs treatment and that he is all better. The grandmother states that the child is no longer on his ADHD medication."

We find it important to note at this juncture that the child was immediately removed from his grandmother's custody and placed into foster care based upon the GAL's allegations that T.K. was in "imminent danger" if he were permitted to remain in the home with his grandmother due to the foregoing allegations against her. West Virginia Code § 49-4-602(a)(1) provides:

> Upon the filing of a petition, the court may order that the child alleged to be an abused or neglected child be delivered for not more than ten days into the care, custody, and control of the department or a responsible person who is not the custodial parent or guardian of the child, if it finds that:
> (A) There exists imminent danger to the physical well-being of the child; and (B) There are no reasonably available alternatives to removal of the child, including, but not limited to, the provision of medical, psychiatric, psychological or homemaking services in the child's present custody.

*See* Syl. Pt. 1, *In re Jonathan P.*, 182 W. Va. 302, 387 S.E.2d 537 (providing that the statute "authorizes, upon the filing of a petition, the immediate, temporary taking of custody of a child by the Department of Human Services when there exists an imminent danger to the physical well-being of the child and there are no reasonably available alternatives to the removal of the child."). We question both the GAL and the circuit court allowing the removal of the child under the "imminent danger" provision of the foregoing statute given the DHHR's investigative report submitted to the circuit court the day before the GAL's abuse and neglect petition was filed. As indicated above, the DHHR reported that T.K. was doing well, was receiving medical care, and was being well cared for. Despite this investigative report, which found no maltreatment by the grandmother, the removal of this child under the "imminent danger provision" caused this child to be yanked from his grandmother's care and placed into foster care, which action triggered mental health issues that necessitated T.K. being hospitalized on two occasions due to suicidal ideations. We have previously held that "[i]t is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians[,]" and courts should not allow such changes unless there actually is imminent danger demonstrated by the allegations in the petition. *See* Syl. Pt. 3, in part, *James M. v Maynard*, 185 W. Va. 648, 408 S.E.2d 400 (1991).

Nevertheless, the circuit court conducted a preliminary hearing on the GAL's petition on September 19, 2019.[9] T.K.'s mother, father and grandmother testified. In addition to testifying

---

[9] Also, on September 19, 2019, the circuit court ordered that the guardianship proceeding, civil action number 19-CIG-9, be consolidated with the abuse and neglect case, number 19-JA-108. In its November 25, 2019, adjudication order, the circuit court dismissed the guardianship proceeding. The circuit court specifically kept jurisdiction over the child's continued custody and placement within the abuse and neglect proceeding because of its adjudication of the child as

4

about the reasons she placed her son with his grandmother as previously mentioned, T.K.'s mother also testified regarding the grandmother's CPS history. The mother testified that "nothing really happened" regarding her childhood involvement with CPS when she lived with the grandmother. Specifically, the mother stated that "when my mother was at work, we were put in the care of my younger brother's father, who decided to leave us home alone." The mother stated that as a child she was placed in foster care a couple of months before being returned to the grandmother. She said that CPS did monthly visits after that, but that "nothing happened." T.K.'s mother also testified that she and the grandmother had had "a bumpy relationship, but what mother— mother/daughter doesn't." She stated that she had not had contact with her mother for about seven years because "I'm stubborn. I said a few things I shouldn't have and I just was too stubborn to apologize." The mother also testified about taking T.K. to counseling for his behavioral problems. When asked if this counseling continued when the child was placed with his grandmother, the mother stated: "She did take him – for [sic] what I was told, she took him to his doctors and his doctor said that it was no longer needed since he was doing so much better with her. And I know for a fact that my mom wouldn't do something without given the go-ahead."

The grandmother also testified at the preliminary hearing. She stated that T.K. came to live with her at the end of May 2019. The grandmother testified that she had been involved with CPS when she resided in Pennsylvania some twenty-five years ago. According to the grandmother,

> [m]y son's father was living with us at the time and we had a disagreement. I was the only one working and he left and I couldn't get – lose my job, and so I thought I had made all the necessary accommodations for my children. My oldest daughter, I believe, was eight at the time . . . had emergency numbers on the fridge and thought I had made for every incident and still had a neighbor watch me go to work and called the authorities and they came and removed the children.

T.K.'s grandmother confirmed that her children were placed in foster care for two or three months. In response to questioning by the GAL concerning whether the grandmother was arrested in connection with her children being removed from her care, the grandmother testified that she was not sure it was in regards to that incident. The GAL asked the grandmother, "[W]hat were your criminal charges?" The grandmother responded, "I don't recall." The GAL then asked the grandmother, "but you were charged criminally around the same time?" The grandmother stated, "[t]here were other things that happened that I'm not – that didn't have to do with that."[10] Regarding grandmother's comment that she was "banned from the State of Pennsylvania[,]" she

_____

abused and neglected due to the father's abandonment. *See* W. Va. R. Minor Guard. P. 13(c) (providing for consolidation of guardianship proceeding with abuse and neglect proceeding).

[10] Despite the allegations in the abuse and neglect petition of the grandmother being criminally charged, other than this brief exchange during the grandmother's testimony regarding a criminal charge around the time of the Pennsylvania CPS incident, there was no other evidence about any criminal charges involving the grandmother or how those charges were resolved.

testified that she believed she "had heard them say that in court and my mother had shared that with me."

The grandmother also testified that after her children were returned to her in Pennsylvania, the family moved to West Virginia. She stated that she had also been involved with CPS in this State. The grandmother testified that when two of her daughters were teenagers they wanted freedom to do as they pleased. The grandmother stated that her daughter contacted CPS because she wanted to live with a friend and believed that getting CPS involved might achieve that result. The grandmother stated that a note was found where the daughter and her friend "had written to each other in school and made a list of what to tell" CPS. The grandmother stated that CPS was contacted, but the children were not taken from the grandmother's home, and there was no abuse and neglect substantiated. Further, the grandmother testified that this had occurred in 1994 or 1995. There was no evidence introduced by either the GAL or the DHHR about any CPS cases involving the grandmother in West Virginia.

Finally, regarding T.K's mental health treatment[11] the grandmother testified that she "heard" about T.K.'s counseling, but had not taken the child to counseling since he had been with her. She stated that she was unaware that the child had made statements about killing himself. She had been told that he had "pee[d] on box springs." Further, she testified that the child had "denied all of it." The grandmother testified T.K. had not "display[ed] any of those [actions] that others had accused him of." Further, the grandmother stated that she had taken T.K. to Dr. Anna Cadavid, a pediatrician.[12] Dr. Cadavid had given her two questionnaires—one for the grandmother and one for T.K.'s teacher—to fill out before T.K.'s next visit. The grandmother testified that Dr. Cadavid wanted them to monitor the child's behavior for use in deciding a treatment plan for T.K. at the next visit. The grandmother stated T.K. was being weaned off the medication due to serious side effects including hair loss, not sleeping well, and the child was "peaked, sickly, tired, just not like a normal nine-year-old." Finally, the grandmother was asked if anyone in the guardianship case, whether the DHHR, the GAL, or anyone else had "come to you and sa[id], listen you need to get this kid into counseling right now?" The grandmother responded, "No." She stated that if someone would have told her that they wanted the child in counseling right now, "he would have went first thing."

At the conclusion of the preliminary hearing, and as set forth in the circuit court's September 24, 2019, order, the circuit court found clear and convincing evidence that imminent danger existed at the time of the removal, and, more specifically, that "the Adult Respondents were not providing the child with mental health treatment at the time of the removal."

The circuit court next held an adjudicatory hearing on October 11, 2019. It is significant that neither the petitioner GAL, who filed the abuse and neglect petition, nor the DHHR offered

---

[11] There was no evidence in the record about what type of mental health treatment or counseling that T.K. had been undergoing while residing with his mother other than the mother's testimony that she had taken the child to counseling at Personal Family Counseling.

[12] The grandmother had also taken the child to the dentist and orthodontist.

6

any additional evidence at this hearing.[13] The grandmother, however, presented evidence, which included the testimony of Dr. Cadavid, T.K.'s pediatrician. Dr. Cadavid stated that she had seen the child twice, with the first visit on July 29, 2019. She testified that the child had a previous diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD"), which had been treated by a doctor in Ohio; however, no medical records from the Ohio doctor were provided to Dr. Cadavid. Instead, Dr. Cadavid relied upon the grandmother for the child's history of medical treatment. The child was on two medications, Concerta and Guanfacine, to treat the ADHD, hyperactivity, agitation, and to help with sleep. T.K. was being weaned off these medications. The grandmother told the doctor that T.K. had been doing well and there were no concerns about his behavior. The doctor stated that, at that time, she followed the weaning down process that the child was then undergoing. She corroborated the grandmother's testimony regarding the questionnaires, which were to be completed before the next visit to make sure that all the child's symptoms were getting better. Dr. Cadavid testified that she had no suspicions of abuse and neglect at the visit and the grandmother gave her no concerns. Interestingly, Dr. Cadavid, who continued to see the child after he was removed from the grandmother's custody, testified that by the time the child had been placed with the second foster family, after being removed from the grandmother's custody, the doctor asked that foster family about the weaning process. The foster family reported that T.K. "was on no medication anymore, and . . . [they] didn't have any concern about behavior or meds or depression." Dr. Cadavid testified that she was unaware of T.K exhibiting any violence towards others or having a history of suicidal ideations. The doctor was also unaware of the child undergoing counseling in Ohio.

Angela Crank, T.K.'s fourth-grade teacher, also testified. Ms. Crank testified that T.K. "was a very sweet kid. He was – wanted to please his teachers. He made friends very quickly. He was not a good academic student, he was very easily distracted, and he would disrupt the class quite frequently, blurting things out. It could be relevant or totally irrelevant." She stated that he was never violent and never made any threats of harm to himself or to others. Ms. Crank also had interacted with the grandmother at a parent conference. She described the grandmother as being very eager to be helpful in any way. The grandmother wanted to know how T.K. was behaving in class, and she was willing to work with Ms. Crank on a plan that would make the child successful. Ms. Crank had no concerns about the child being abused or neglected. The grandmother had disclosed to her that the child had been on lots of medications and had been weaned off those medications.

Finally, Anna Bailey, who was a former employee with Jackson County CPS and married to the grandmother's brother, testified. Ms. Bailey had observed T.K. with the grandmother and testified that she personally had not observed any issues with the child. She said the grandmother had mentioned something about the child being suicidal or self-harming, but that had occurred when T.K. was with his mother. Ms. Bailey was unaware of any issues while the child had been in the grandmother's care.

---

[13] Pursuant to the DHHR's request, the circuit court took judicial notice of the prior testimony elicited during the preliminary hearing and rested on that evidence.

On November 25, 2019, the circuit court entered a thirteen-page order, adjudicating T.K. as an abused and neglected child based upon the father's abandonment of the child.[14] Based upon the evidence admitted against the grandmother to prove the allegations in the petition, the circuit court refused to adjudicate the grandmother as an abusing parent.[15] Specifically, the circuit court made the following findings in regard to the grandmother's prior involvement with CPS:

> Petitioner and DHHR failed to establish by clear and convincing evidence that Grandmother is unfit to be T.K.'s guardian on this basis. The only instance of substantial abuse and neglect occurred nearly 25 years ago, and the only proof of this incident was Grandmother's own admission. No records or other evidence was presented by Petitioner or DHHR regarding the same. Grandmother's children were returned to her following this incident. Accordingly, the Court can safely assume that termination of parental rights did not occur from this Court proceeding.
>
> 37.     Regarding any other CPS history that occurred in West Virginia, the record is completely devoid of any evidence as to the substance of any such claims. The evidence of record, again coming from Grandmother herself, is that referrals to CPS were false reports by Grandmother's teenage daughters. The only other testimony regarding this CPS history was from . . . [the mother], who testified that "nothing really happened."[16]

(Footnote added). Additionally, the circuit court found that

> both DHHR and Petitioner [GAL] have failed to prove any correlation between Grandmother's admitted neglect of her children in the State of Pennsylvania nearly twenty-five years ago and her

---

[14] *See supra* note 8.

[15] *See* W. Va. Code § 49-1-201 (defining "abusing parent" as "a parent, guardian, or other custodian . . . whose conduct has been adjudicated by the court to constitute abuse or neglect as alleged in the petition charging child abuse or neglect.").

[16] The circuit court also found concerning the alleged CPS involvement in this State:

> It is particularly troubling to the Court that Petitioner and DHHR failed to present any records or testimony regarding those prior investigations to establish the legitimacy of those claims. Again, it is the petitioner who has the burden in a child abuse and neglect case. The Court cannot speculate whether these claims were substantiated, and it certainly cannot use such unproven allegations to adjudicate Grandmother.

ability to care for TK at the time of the petition. No basis in the law has been presented to adjudicate Grandmother on the basis of this old, uncorroborated, out-of-state CPS history.

The circuit court also found that Dr. Cadavid "rebutted the allegations that Grandmother neglected TK's medical care[,]" stating that the grandmother "took TK to see Dr. Cadavid and Dr. Cadavid began the process of assessing and treating TK.[17] But the treatment plan never materialized because TK was removed before TK's follow-up visit." Further, the circuit court found that the grandmother testified "no one from DHHR ever requested Grandmother enroll TK into counseling; no evidence indicated Petitioner made such a request prior to filing the Petition. Grandmother testified she would have complied if any such request was made." The circuit court also found:

> 42.  Regarding the decision to wean TK from his medication, the evidence shows the weaning process continued to its conclusion without incident after TK was removed from Grandmother's custody.

> 43.  West Virginia Code explicitly provides a mechanism whereby Petitioner or DHHR could have sought a Court ordered examination of TK by a physician, psychologist, or psychiatrist in support of the allegations of medical neglect contained in the Petition, and to ensure TK would receive any necessary ongoing care. *See* W. Va. Code § 49-4-603. Despite allegations Grandmother was not providing adequate medical care for TK, the record contains no indication such an examination was ever sought by Petitioner or DHHR. Neither Petitioner nor DHHR have made any showing why this Court should supplant the medical decisions of Dr. Cadavid.

In addition to refusing to adjudicate the grandmother as an abusing guardian, the circuit court determined that placement of T.K.'s physical custody with the grandmother was in the child's best interest; however, the circuit court further found that it was in the child's best interest for legal custody of the child to remain with the DHHR. Significantly, the circuit court ordered the DHHR to file a case plan including a plan to facilitate the return of T.K. to grandmother and a plan to address his "medical/psychological/psychiatric needs while TK is in relative care with Grandmother." The circuit court directed that upon the child's release from Highland Hospital,[18] the DHHR was to "cause T.K. to be examined by a qualified child psychologist or psychiatrist to

---

[17] On the remaining allegation made by the GAL regarding the grandmother not seeing T.K. for years prior to his placement with her, the circuit court found that the mother testified that she was estranged from the grandmother for several years because "she said things to Grandmother she 'regretted' and was 'just too stubborn to apologize.'"

[18] As previously mentioned, T.K. was hospitalized in Highland Hospital while in foster care, after being removed from the grandmother's custody. T.K. was released from Highland Hospital on November 26, 2019, and physical custody was returned to the grandmother.

determine appropriate mental health care and/or medications for TK during and after the pendency of this case." The grandmother was to be provided with a copy of any discharge instructions for the child following his inpatient treatment. Finally, the grandmother was "ORDERED to follow said discharge instructions upon TK's return to her home."

Based upon the circuit court's decision not to adjudicate the grandmother as abusing and to return physical custody of T.K. to her, the GAL filed the instant writ of prohibition.

## II. Standard of Review

As this Court has previously stated:

> A "writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has no jurisdiction of the subject matter in controversy, or, having such jurisdiction, exceeds its legitimate powers." W. Va. Code § 53-1-1 (1923); *accord* Syl. Pt. 2, in part, *State ex rel. Peacher v. Sencindiver*, 160 W.Va. 314, 233 S.E.2d 425 (1977) ("A writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers."). To evaluate whether a lower court has acted in excess of its legitimate powers, we consider the following factors:

> > In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

10

Syl. Pt. 4, *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996).

*State ex rel. H.S. v. Beane*, 240 W. Va. 643, 646, 814 S.E.2d 660, 663 (2018). Guided by these precepts, we turn to the issues before us.

### III. Discussion

The sole issue before the Court is whether the circuit court committed clear legal error by failing to adjudicate the grandmother as abusing and in returning physical custody of the infant child, T.K., to the grandmother.[19] The GAL contends that the circuit court erred in finding that she failed to prove the allegations in the petition by clear and convincing evidence. She argues the uncontroverted evidence proved: 1) the grandmother had an admitted history with CPS and related criminal charge; 2) the grandmother failed to seek mental health treatment for T.K.; and 3) the grandmother was absent from T.K.'s life for years preceding the mother's placement with the grandmother.

First, we consider the GAL's argument that the circuit court improperly discounted the grandmother's admitted history with CPS and the connected criminal charge. In support of this argument, the GAL relies upon Rule 10 of the West Virginia Rules of Minor Guardianship.[20] Rule

---

[19] We note that the GAL presents two assignments of error, the first of which misstates the circuit court's decision that the grandmother was found to be "an abusing parent." The GAL's assigned errors were:

> 1. Did the Circuit Court of Jackson County, West Virginia[,] err in finding the Adult Respondent grandmother an abusing parent after hearing evidence of her prior CPS history and criminal history, and her failure to provide mental health treatment to the Infant Respondent T.K.?
>
> 2. Did the Circuit Court of Jackson County, West Virginia[,] err in restoring custody of Infant Respondent T.K. to the Adult Respondent Grandmother after hearing evidence of her CPS and criminal history, and her minimal contact with the minor child through his life?

Assuming that the GAL meant that the circuit court found the grandmother a "nonabusing parent," because the two assigned errors are repetitive, for purposes of this decision they are consolidated into a single issue.

[20] As mentioned above, the guardianship proceeding was consolidated with the abuse and neglect proceeding, and then dismissed. *See supra* note 9. Due to the dismissal of the guardianship proceeding, the circuit court did not expressly examine the Rule 10 screening factors in its adjudicatory order, although it is clear that the circuit court implicitly considered the two factors

11

10 establishes certain screening factors that a circuit court is to consider in determining an appropriate guardian for a minor in a minor guardianship proceeding instituted pursuant to West Virginia Code § 44-10-1 to -16, including, in relevant part:

> The court, when determining an appropriate guardianship appointment over the person of a minor, shall ascertain and consider, among other pertinent matters, whether any proposed guardian:
>
> . . . .
>
> 2) Has a record of any misdemeanor or felony convictions;
>
> . . . .
>
> 4) Has ever been the subject of any substantiated report alleging child abuse, neglect, or molestation made to any child protection agency, other law enforcement agency, or court in any jurisdiction.
> . . .

W. Va. R. Minor Guard. P. 10, in pertinent part. The GAL argues that the evidence offered regarding whether the "proposed guardian" has ever been the subject of any substantiated report of abuse or neglect and has any misdemeanor or felony convictions weighs against finding the grandmother an appropriate guardian for the child. *Id*. We disagree.

It is axiomatic that the screening factors set forth in Rule 10 are to be considered by a circuit court in determining an appropriate guardian for an infant child, "among other pertinent matters," which language necessarily also encompasses what is in the child's best interest. *See* W. Va. Code § 44-10-3 (pertaining to the appointment and termination of guardian for a minor and providing that the court may appoint a temporary guardian for a minor as long as "the appointment is in *the minor's best interest*") (emphasis added). As with all decisions a court makes that affect children, what is in the child's best interest is of paramount concern. *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) ("[T]he best interests of the child is the polar star by which decisions must be made which affect children."). Further, *In re Guardianship of A.C.*, 240 W. Va. 23, 807 S.E.2d 271 (2017), the Court discussed Rule 10 in the context of also evaluating the best interests of the child. *Id*. at 27-29, 807 S.E.2d at 275-77. The petitioner, in *Guardianship of A.C.*, argued that the circuit court's placement of the child with the grandmother was not in the child's best interest and failed to include "an appropriate evaluation of the Guardianship Screening Factors enumerated in Rule 10." 240 W. Va. at 24, 807 S.E.2d at 272. We agreed, finding, among other things, that the circuit court had disregarded overwhelming evidence of unfitness of the grandmother, including the grandmother abusing alcohol and possibly drugs, driving on a revoked license, and permitting "individuals with various and sundry drug and other issues to live in the home." *Id*. at 28, 807 S.E.2d at 276. We recognized that

identified by the GAL in reaching its determination that the grandmother was a fit, nonabusing guardian. Despite the lack on any express ruling by the circuit court on this issue, we consider the GAL's argument.

the circuit court appears to have undervalued the Guardianship Screening Factors; those factors require courts to consider whether the proposed guardian has convictions, abuses drugs or alcohol, or has allowed a registered sex offender and drug abusers to live in the home. *See* W.Va. R. Prac & P. Minor Guardianship Proc. 10.

240 W. Va. at 28, 807 S.E.2d at 276.

The instant case, however, is factually distinguishable from *Guardianship of A.C.*, because the circuit court did not undervalue the screening factors set forth in Rule 10, but carefully considered the evidence presented and made a decision that was undeniably in the child's best interest. Despite the GAL's evidence that the grandmother admitted to a history with CPS in both Pennsylvania and West Virginia,[21] the GAL completely disregards the fact that the removal occurred some twenty-five years ago and that the grandmother's children were returned to her care after a two- to three-month period. Succinctly stated, the GAL failed to prove any connection between the grandmother's admitted history with CPS involving her children in Pennsylvania that occurred almost twenty-five years ago and her ability to serve as T.K.'s guardian at the time of the petition. The GAL further contends that "there was ongoing CPS involvement in West Virginia." The grandmother, however, testified that the CPS involvement in this State also happened in 1994 or 1995 and that CPS was contacted, but the children were not taken from her home, and there was no abuse and neglect substantiated. The GAL offered no other evidence regarding any West Virginia CPS involvement with the grandmother. *See supra* notes 16 and 21. Finally, neither the Rule 10 screening factors nor any other legal authority offered by the GAL supports the GAL's position that the grandmother had to be adjudicated as abusing or was otherwise not an appropriate guardian for T.K., on the basis of an uncorroborated twenty-five-year-old CPS history resulting from an incident which did not result in a termination of parental rights, but only brief removal of the children from the home.

Next, the GAL argues that the circuit court erred in not adjudicating the grandmother as abusing on the basis that she failed to seek mental health treatment for T.K. and weaned the child off his medication. We disagree. Our review of the evidence shows that once the child was in the grandmother's care, she sought medical treatment for him with Dr. Cadavid, who assessed the child's medical condition. According to the testimony, Dr. Cadavid was working with the grandmother to determine the child's treatment plan going forward, which could have included

---

[21] The GAL recognizes that there was no other evidence regarding CPS's involvement introduced below, stating that "[w]hile it is true that there were no records presented, it is not necessary to present these records inasmuch as the parties admitted to this CPS history." The GAL claims she did "make efforts" to obtain the West Virginia records, but "the referrals predate the current FACS system, so I was told they were unavailable." The GAL also asserts that with the current system, records are not available after seven years; but she offered no evidence to support this statement. It is significant that the GAL offered no evidence that she ever attempted to locate any of the CPS records from either Pennsylvania or West Virginia. Rather, the GAL simply argues that based on the testimony presented, "it simply was not necessary to present those records."

medication, counseling or other treatment. Further, regarding the child being weaned off medication, the evidence showed that when T.K. was seen by Dr. Cadavid, the doctor was told by the grandmother that the child was being weaned off two medications. Dr. Cadavid testified that she had no suspicions of abuse and neglect at the visit and the grandmother gave her no concerns. Interestingly, the doctor, who continued to see the child after he was removed from grandmother's custody, testified that by the time the child had been placed with the second foster family, she asked them about the weaning-off process and was told that "he was on no medication anymore," and that they "didn't have any concern about behavior or meds or depression." Finally, the evidence was that neither GAL nor the DHHR requested grandmother enroll T.K. in any type of mental health counseling when she first got custody of the child; according to the grandmother's testimony, had that request been made, she would have done so.

Finally, the GAL argues that the grandmother's absence from T.K.'s life for nine years preceding the mother's placement of the child with her was evidence that T.K.'s placement with the grandmother was not in the child's best interest. The GAL contends that while there is a grandparent preference, the best interests of a child is controlling and, in this case, the circuit court ignored the best interests of the child. *See* Syl. Pt. 2, *In re K.E.*, 240 W. Va. 220, 809 S.E.2d 531 (2018) ("'West Virginia Code § 49-3-1(a) provides for grandparent preference in determining adoptive placement for a child where parental rights have been terminated and also incorporates a best interests analysis within that determination by including the requirement that the DHHR find that the grandparents would be suitable adoptive parents prior to granting custody to the grandparents. The statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child.' Syllabus Point 4, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005)."); *see also* W. Va. Code § 49-4-114(a)(3) (2015) ("For purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it shall assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents.").

The evidence before us, however, shows the GAL ignored T.K.'s mother's testimony that the grandmother's absence from her grandchild's life was due to the mother's behavior, and was not the grandmother's choice. We also disagree with the GAL's assertion that placement of T.K. in the grandmother's care was not in the child's best interest, as the circuit court determined. All the evidence showed that the child was well cared for and was thriving while in his grandmother's care. In short, the evidence simply does not support the GAL's contention that the circuit court disregarded T.K.'s best interest in placing the child with his grandmother.

Moreover, the circuit court's determination that the GAL failed to prove the allegations against the grandmother contained in the abuse and neglect petition by clear and convincing evidence is amply supported by the record. *See* W. Va. Code § 49-4-601(i) ("At the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall

14

make findings of fact and conclusions of law as to whether the child is abused or neglected and whether the respondent is abusing, neglecting, or, if applicable, a battered parent, all of which shall be incorporated into the order of the court. The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence."); *accord* Syl. Pt. 3, *In re K.P.*, 235 W Va. 221, 772 S.E.2d 914 (2015).

As an ancillary matter, we recognize that T.K. has experienced serious mental health issues that have required two hospitalizations. Given the concern of all the parties to the status of this child's mental health, upon return of this case to the circuit court, we direct the circuit court to conduct a hearing within thirty days in order to ensure that the DHHR has complied with the circuit court's directives in its November 25, 2019, adjudicatory order, which included: 1) the DHHR filing a case plan that addresses "TK's medical/psychological/psychiatric needs while TK is in relative care with Grandmother[;]" 2) the DHHR causing the child "to be examined by a qualified child psychologist or psychiatrist to determine appropriate mental health care and/or medications for TK during and after the pendency of this case[;]" and 3) the grandmother fully complying with any treatment directives that have been made by the child's treating physician(s). In this same vein, we remind the circuit court that Rule 39(b) of the Rules of Procedure for Child Abuse and Neglect Proceedings requires:

> At least once every three months until permanent placement is achieved as defined in Rule 6, the court shall conduct a permanent placement review conference, requiring the multidisciplinary treatment team to attend and report as to progress and development in the case, for the purpose of reviewing the progress in the permanent placement of the child.

While the Court understands from the Rule 11 status updates filed in this case that the child is thriving while in the grandmother's care, the circuit court should make every effort to ensure that he receives any necessary mental health treatment recommended by his medical providers.

## IV. Conclusion

For the foregoing reasons, we conclude that the circuit court did not commit clear error, lack jurisdiction, or exceed its legitimate powers in failing to adjudicate the grandmother as abusing, or in returning physical custody of T.K. to the grandmother. Accordingly, the petition for writ of prohibition is denied.

Writ Denied.

**ISSUED:** May 26, 2020

**CONCURRED IN BY:**

Chief Justice Elizabeth D. Walker
Justice Margaret L. Workman
Justice Tim Armstead
Justice Evan H. Jenkins

15

The Honorable Michael D. Lorensen sitting by temporary assignment.

**DISQUALIFIED**:
Justice John A. Hutchison